# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UGI SUNBURY LLC, <br><br> Plaintiff. <br><br> v. <br><br> A PERMANENT EASEMENT FOR 1.7575 ACRES, AND TEMPORARY CONSTRUCTION AND ACCESS EASEMENT FOR 2.956 ACRES IN LIMESTONE TOWNSHIP, MONTOUR COUNTY, PENNSYLVANIA TAX PARCEL NO. 5-10-19, et al. <br><br> Defendants. | No. 3:16-CV-00788 <br><br> (Judge Brann) |

## MEMORANDUM OPINION

### AUGUST 27, 2018

**I.  BACKGROUND**

On July 1, 2015, UGI applied to the Federal Energy Regulatory Commission for authorization under the Natural Gas Act[1] to construct a 34.4-mile natural gas pipeline and related facilities through portions of Snyder, Union, Northumberland, Montour, and Lycoming Counties, to a power plant located in Snyder County (the "Sunbury Pipeline Project").[2]  FERC approved UGI's application and issued a

---

[1]  15 U.S.C. § 717f(c).

[2]  UGI Sunbury, LLC, 155 FERC 61 ¶ 61,115 at 1-2 (2016).

certificate of public convenience and necessity ("FERC Certificate") to UGI on April 29, 2016.[3]

Because the planned pipeline traversed Defendants' property,[4] UGI needed to obtain permanent easements from the Defendants for the areas on (and under) which the pipeline and related facilities would sit once completed. UGI also needed to obtain temporary easements for areas of Defendants' land that would be occupied temporarily during the construction. The parties attempted to negotiate compensation terms for those easements, to no avail. Consequently, UGI filed a complaint in this Court, seeking to obtain the necessary easements through condemnation.[5]

On August 2, 2016, this Court issued an Order granting the requested easements to UGI.[6] A two-day bench trial was subsequently held on April 16 and

---

[3] *Id.*

[4] The property in question is located in Limestone Township, Montour County, Pennsylvania. April 15, 2018 Trial Transcript ("Trial Transcript I") at 12. At the time of trial, the property was owned jointly by Defendant David Beachel and his ex-wife, Defendant Joy Beachel, but Mr. Beachel was in the process of paying Ms. Beachel for her share. *Id.* at 12-13.

[5] *See* 15 U.S.C. § 717f(h) ("When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts.")

[6] ECF No. 21.

17, 2018, in order to determine the amount of compensation owed to Defendants as a result of that taking.[7]

Defendant David Beachel, the property's owner, was the first witness at that trial. Mr. Beachel explained how he has used his land to operate a dairy and kosher poultry farm,[8] which farming operation has continued essentially undisturbed after the pipeline installation was complete.[9] Mr. Beachel also described the current structures on his property, which include several barns and the farmhouse in which he lives.[10] Regarding the property's value, Mr. Beachel testified that he believed that his property was worth $850,000 right before the taking of the permanent easement[11] and $600,000 immediately after it[12]—a difference of $250,000. Mr. Beachel also noted that the temporary easement covered an area normally used by him to grow feed crops for his livestock, and that UGI's use of that land required him to spend $4,000 purchasing replacement feed.[13]

---

[7] UGI apparently settled with Joy Beachel before trial for the sum of $28,365. *See* ECF No. 76-1.

[8] *See, e.g.*, Trial Transcript I at 13-16

[9] *Id.* at 104.

[10] *Id.* at 23.

[11] *Id.* at 39.

[12] *Id.* at 64.

[13] *Id.* at 55.

The next witness was Mr. Beachel's land valuation expert, Don Paul Shearer, who explained that he calculated the pre-taking value of Mr. Beachel's property by using the "sales comparison approach."[14] After analyzing Mr. Beachel's 96.3-acre property (which analysis included an inspection of the interior and exterior of the property's buildings),[15] Mr. Shearer determined that Mr. Beachel's current use of the property for agricultural purposes was, in fact, the property's "highest and best use."[16] As a result, Mr. Shearer selected six nearby, recently-sold farms to use as comparators.[17] Those farms ranged in size from 77 to 156 acres, and were all improved with varying numbers of farm-related buildings. Their overall sales prices ranged from $610,000 to $1,350,000; calculated on a per-acre basis, the least expensive property sold for $6,351 per acre, the most for $9,990 per acre.[18] Because Mr. Shearer believed that the improvements to Mr. Beachel's property were "superior" to most of those comparator properties, Mr. Shearer calculated that Mr. Beachel's property was worth $10,000 per acre immediately before the taking, for a (rounded) total of $965,000.[19]

---

[14] Trial Exhibit D-1, Don Paul Shearer's Appraisal Report ("DPS Report") at 19-20.

[15] Trial Transcript I at 130-31.

[16] DPS Report at 17-18.

[17] *Id.* at 21-24.

[18] *Id.*

[19] *Id.* This appraisal was calculated to be effective as of August 2, 2016, the undisputed date of the taking. *Id.* at 2.

Mr. Shearer could not find comparable properties to use when calculating the property's post-taking value (*i.e*, properties sold after the installation of a natural gas pipeline);[20] therefore, he relied on a self-authored "damaged goods" theory.[21] Under this theory, potential buyers of Mr. Beachel's property would, when calculating the property's value, consider not only the land actually utilized and occupied by the gas pipeline and its appurtenances, but would also consider the fact that the remaining land "potentially could be damaged"—presumably, by a natural gas pipeline explosion. This potential danger would, under Mr. Shearer's theory, create a "stigma" on the property, lowering its value. In his report, Mr. Shearer admitted that "[m]easuring the effect of [such] stigma on value can be difficult," and that "[i]t is often and most usually difficult for a qualified real estate appraiser or analyst to quantify the actual loss . . . as an objective opinion."[22] Correspondingly, "[a]ny opinion of said diminution in value is very subjective."[23] It was Mr. Shearer's opinion, however, "[b]ased on [his] experience in appraising properties affected by stigma and as damaged goods," that the post-taking value of Mr. Beachel's property was $579,000[24]—a decrease from its pre-taking value of

---

[20] Trial Transcript I at 168.

[21] DPS Report at 7-9.

[22] *Id.* at 7-8.

[23] *Id.* at 25.

[24] *Id.* at 26.

40%, or $386,000. Mr. Shearer did not place a separate value on the taking of the temporary easement.

The next trial witness was John Gillooly, the land valuation expert for UGI Sunbury. Like Mr. Shearer, Mr. Gillooly utilized the sales comparison approach to determine the subject property's pre-taking value.[25] Because Mr. Gillooly also determined that the property's highest and best use was continued agricultural use,[26] he—again, like Mr. Shearer—selected nearby farms to serve as comparators.[27] Unlike Mr. Shearer, however, the four selected farms were devoid of improvements, and comprised vacant farmland.[28] As Mr. Gillooly explained at trial, this was a deliberate choice on his behalf; while the pipeline cut through Mr. Beachel's open fields, its installation did not require the demolition or alteration of any of the structures located on the property.[29]

The sales prices of these comparator farms ranged from $530,000 to $780,000, with per-acre values ranging from $4,911 to $7,557.[30] Based on various

---

[25] Trial Exhibit P-2, John Gillooly's Appraisal report ("JG Report") at 22.

[26] JG Report at 21.

[27] *Id.* at 23-26.

[28] *Id.*

[29] April 16, 2018 Trial Transcript ("Trial Transcript II") at 82. See also JG Report at 21 ("While the proposed permanent easement encumbers a portion of the subject property, no buildings or significant building envelope will be encroached upon or be affected by the easement.").

[30] JG Report at 29.

"adjustments" to these per-acre prices, Mr. Gillooly concluded that Mr. Beachel's farm was worth $6,500 per acre, for a pre-taking (rounded) total of $630,000.[31]

Once again, like Mr. Shearer, Mr. Gillooly could not find comparable post-taking properties,[32] and therefore used an alternate methodology. Regarding the permanent easement's effect on the value of Mr. Beachel's property, Mr. Gillooly first concluded that UGI Sunbury's use of the land encumbered by that easement would "consume" 75% of that land's "fee value." He then multiplied his pre-taking, per-acre estimated value of $6,500 by the size of the permanent easement (1.7575 acres), and further multiplied that number by 75%. The rounded result—$8,600—was Mr. Gillooly's appraisal of the value of the permanent easement; his appraisal of the land's post-taking value, then, was $621,400 ($630,000 – $8,600 = $621,400).[33]

To calculate the value of the temporary easement, Mr. Gillooly multiplied his pre-taking, per acre estimated value of $6,500 by the size of the temporary easement (2.9560 acres), and multiplied that number by 6% (his calculation of the land's "annual rental rate).[34] Because he believed that result was too small to

---

[31] *Id.*

[32] Trial Transcript II at 82.

[33] This appraisal was based on an effective date of October 13, 2015. JG Report at 1. At trial, however, Mr. Gillooly testified that, based on his research, that calculated value would have remained the same through August 2, 2016, the undisputed date of the taking. Trial Transcript II at 45-46.

[34] JG Report at 32.

"allow for transactional costs," he rounded that number up to a "nominal value" of $1,500.[35]

The final trial witness was Casey Monagan, the Sunbury Pipeline Project's project manager. Mr. Monagan discussed pipeline installation generally, including how easements such as those taken from Mr. Beachel's property generally play out in practice.[36]

## II. DISCUSSION

Mr. Beachel, as the landowner, has the burden of proving the amount of compensation he is owed for the takings in this case.[37]

Because the permanent easement is a partial taking—*i.e.*, because UGI did not take the entirety of Mr. Beachel's property, but only certain rights from certain portions of it— "just compensation" for that taking is determined "by the difference between the market value of the entire holding immediately before the taking and the remaining market value immediately thereafter of the portion of property rights not taken."[38]

---

[35] *Id.*

[36] Trial Transcript II at 106-150.

[37] *Tennessee Gas Pipeline Co. v. Permament Easement for 1.7320 Acres*, 2014 WL 90700 (M.D. Pa. Feb. 24, 2014) at *11.

[38] *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 n.3 (3rd Cir. 1990). This is the federal standard, which both parties agree applies in this case. *See* UGI's Post-Trial Proposed Conclusions of Law (ECF No. 89) ¶ 166; Mr. Beachel's Post-Trial Proposed Conclusions of Law (ECF No. 90) ¶¶ 1-3.

The two experts in this case, Mr. Shearer and Mr. Gillooly, came to quite divergent pre-taking values: $965,000 and $630,000, respectively. Since both appraisers basically agreed upon various attributes of Mr. Beachel's property (including its size and improvements), the difference in these numbers is due entirely to each individual's appraisal of the pre-taking per-acre value of Mr. Beachel's land. As noted above, while Mr. Shearer used improved farms as comparators, Mr. Gillooly used vacant land, a decision he based upon his opinion that the pipeline would not affect any of the land's improvements.

This Court is not convinced that Mr. Gillooly's approach is sound. While the pipeline and it appurtenances may not have physically affected any of the structures on Mr. Beachel's land, it does not follow that Mr. Beachel's land is less valuable *before* that pipeline is even installed. Additionally, common sense would dictate that an acre of farmland abutted by a barn and other farm-related structures would be worth more than an otherwise identical acre *sans* the proximity of useful buildings. Therefore, this Court will accept Mr. Shearer's appraisal and find that the market value of Mr. Beachel's land before the taking of the permanent easement was $10,000 per acre, for a total of $963,000.

Mr. Gillooly's approach is arguably better suited for determining the value of land actually occupied by the permanent easement itself. However, this Court has a hard time accepting Mr. Gillooly's conclusion that the installation of a

comparatively large pipeline, carrying explosive natural gas, has absolutely no impact on the value of the remaining portions of Mr. Beachel's land not so encumbered. Instead, this Court is inclined to agree with Mr. Shearer that some form of "stigma" attaches to the property as a whole.[39]

This Court, however, cannot agree with Mr. Shearer that the effect of that stigma results in a 40% decrease to the value of Mr. Beachel's property. It seems patently impossible that this pipeline, large as it is, eliminates nearly half the value of Mr. Beachel's farmhouse and other buildings, which are apparently located around 1,000 feet away from that pipeline.[40] Mr. Shearer himself said that his theory is based upon a "very subjective" foundation, and this Court concurs. Consequently, this Court will find that the value of Mr. Beachel's property was reduced by <u>15%</u>—not 40%—as a result of the taking of the permanent easement, and will therefore find that the property's post-taking value was $818,550, a decrease of $144,450 from its pre-taking value.

Regarding the temporary easement, Mr. Beachel testified that he had to spend $4,000 to replace the crops that he would have grown on the land occupied

---

[39] *See, e.g.*, *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1079 (5th Cir. 1996) ("[T]his Court [has] recognized the viability of claims for severance damages based on the likelihood that prospective buyers would fear hazards arising from the [condemnor's] use of condemned property."); *Vector Pipeline, L.P. v. 68.55 Acres of Land*, 157 F. Supp. 2d 949, 957 (N.D. Ill. 2001) ("evidence of stigma damages . . . may be credited"); *see generally* Vitauts M. Gulbis, Annotation, *Fear of Powerline, Gas or Oil Pipeline, or Related Structure as Element of Damages in Easement Condemnation Proceeding*, 23 A.L.R.4th 631 (1983).

[40] Trial Transcript II at 131.

by UGI during the construction. It is not clear, however, how much Mr. Beachel would have expended, both in labor and in supplies, if he were permitted to grow the crops in question—*i.e.*, it is not clear that the $4,000 expenditure was, in fact, a pure loss. This figure, then, does not seem to be a solid basis on which to calculate just compensation for the taking of the temporary easement.

Mr. Beachel presented no evidence contradicting Mr. Gillooly's claim that a fair rental rate for his land should be 6% of that land's value, so this Court will accept that rate. Utilizing Mr. Shearer's $10,000 per-acre value, it appears that the fee simple value of the land encompassed by the temporary easement (2.9560 acres) was $29,560. The temporary easement was exactly one year in duration; therefore, this Court will find that $1,773.60 (6% of $29,560) will justly compensate Mr. Beachel for its use.

## III. CONCLUSION

In sum, then, this Court will find that just compensation in this case is $144,450 for the permanent easement and $1,773.60 for the temporary easement, for a total of $146,223.60. Mr. Beachel asserts, and UGI does not dispute, that he is entitled to prejudgment interest on that award. At a rate of 3%,[41] that interest comes to $9,073.88, bringing the total to $155,297.48. UGI asserts, and Mr.

---

[41] The rate of prejudgment interest is within this Court's discretion. *Tennessee Gas Pipeline Co. v. Permanent Easement for 1.7320 Acres*, 2014 WL 690770 at *13 (M.D. Pa. Feb. 24, 2014). In this case, the prejudgment interest began accruing on the undisputed date of the taking (August 2, 2016).

Beachel does not dispute, that this award should be reduced by $28,365, the amount UGI agreed to pay Mrs. Beachel under the terms of a pretrial settlement agreement. This Court, therefore, will enter judgment in favor of Mr. Beachel in the amount of $126,932.48. An appropriate order follows.

## IV. FINDINGS OF FACT

1. David and Joy Beachel own 96.2988 acres of property at 599 Strick Road, Limestone Township, Montour County, Pennsylvania ("the Property").

2. On August 2, 2016, this Court granted UGI Sunbury LLC a permanent easement and a temporary easement over the Property.

3. The permanent easement consisted of 1.7575 acres.

4. The temporary easement consisted of 2.9560 acres.

5. At the time of the taking, the Beachels operated a farm on the Property.

6. The farm contained several barns, a large field in which to grow crops, and the farmhouse in which the Beachels lived.

7. The Beachels continued to operate their farm on the Property after the taking.

8. UGI Sunbury installed a natural gas pipeline under the land covered by the permanent easement.

9. The pipeline went through the field but did not disturb any of the buildings on the Property.

10. UGI Sunbury utilized the land covered by the temporary easement for a period of one year during the construction of that pipeline.

11. UGI Sunbury's use of the temporary easement did not disturb any of the buildings on the Property.

12. The highest and best use of the Property was its current agricultural use.

13. The market value of the Property immediately before the taking was $963,000.

14. The taking of the permanent easement caused the value of the Property to decrease in value.

15. Part of that decrease in value was due to the "stigma" associated with having a natural gas pipeline installed on the property.

16. The market value of the property immediately after the taking was $818,550.

17. Just compensation for the taking of the permanent easement, then, was $144,450.

18. The market value of the land encumbered by the temporary easement was $29,560.

19. The yearly rental value of that land was 6% of its fair market value.

20. Just compensation for the taking of the temporary easement, then, was $1,773.60.

21. Total just compensation for the taking of the permanent and the temporary easements was $146,223.60.

22. The Beachels are entitled to 3% interest on their total just compensation award, beginning on August 2, 2016, for a total of $9,073.88.

23. The total award to the Beachels from UGI Sunbury, therefore, is $155,297.48.

24. Because UGI Sunbury agreed to pay $28,365 to Mrs. Beachel to settle her claim against it, UGI Sunbury may subtract that amount from the amount it owes Mr. Beachel.

25. Mr. Beachel is, therefore, entitled to an award of $126,932.48 from UGI Sunbury for its taking of a permanent and a temporary easement on the Property.

## V. CONCLUSIONS OF LAW

1. The Beachels are entitled to just compensation from UGI Sunbury for the taking of their property.[42]

---

[42] *United States v. Miller*, 317 U.S. 369 (1943); 15 U.S.C. § 717f(h).

2. Federal law governs the calculation of that compensation.[43]

3. Under federal law, just compensation "is measured by the difference between the market value of the entire holding immediately before the taking and the remaining market value immediately thereafter of the portion of property rights not taken."[44]

4. Immediately before the taking, the market value of the Beachels' property was $963,000.

5. Immediately after the taking, the market value of the Beachels' property was $818,550.

6. Therefore, just compensation for the taking of the permanent easement on the Beachels' property is $144,450.

7. The market value of the land encumbered by the temporary easement on the Beachels' property was $29,560.

8. The yearly rental value of that land was 6% of its market value.

9. Just compensation for the taking of the temporary easement, then, was $1,773.60.

10. The total just compensation owed to the Beachels for the permanent and the temporary easements is $146,223.60.

---

[43] *Tennessee Gas Pipeline Co. v. Permanent Easement for 1.7320 Acres*, 2014 WL 690700 at *10 (M.D. Pa. Feb. 24, 2014).

[44] *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 n.3 (3rd Cir. 1990).

11. The Beachels are entitled to 3% prejudgment interest on their award.

12. Prejudgment interest began accruing on August 2, 2016—the date of the taking.

13. The Beachels are entitled to $9,073.88 in prejudgment interest.

14. The Beachels' total award, therefore, is $155,297.48.

15. Because UGI Sunbury already agreed to pay Mrs. Beachel $28,365, it may reduce that amount from the Beachels' total award.

16. UGI Sunbury owes Mr. Beachel $126,932.48.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge